## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANIMAL LEGAL DEFENSE FUND,
525 East Cotati Avenue
Cotati, CA 94931,

LISA DOWELL,
2401 Little Fox Lane
Vienna, VA  22181, and

CHRISTINA MANOS-BOCEK,
3142 Pelham Place
Doylestown, PA 18902,

                 Plaintiffs,

     v.

BROOKE ROLLINS, SECRETARY,
United States Department of Agriculture,
1400 Independence Avenue SW
Washington, DC 20250,

UNITED STATES DEPARTMENT OF
AGRICULTURE,
4700 River Road
Riverdale, MD 20737, and

FOOD SAFETY & INSPECTION SERVICE,
United States Department of Agriculture,
1400 Independence Avenue SW
Washington, DC 20250,

                 Defendants.

Case No. 25-cv-461

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## <u>INTRODUCTION</u>

1.      Plaintiffs Animal Legal Defense Fund, Lisa Dowell, and Christina Manos-Bocek bring this action to vacate and enjoin the unlawful approval of deceptive chicken and turkey labels by Defendants, the federal agencies and officials charged with protecting consumers from misleading imagery and graphics on poultry product labeling.

2.      Labels convey a variety of meaningful information to consumers of poultry products, from the product ingredients to myriad facts about how a bird was raised. One common way labels convey such facts is through graphics and imagery.

3.      Defendant U.S. Department of Agriculture ("USDA"), under the authority of Defendant Secretary Brooke Rollins, is obligated to review labeling under the Poultry Products Inspection Act ("PPIA") to prevent sellers of chicken and turkey products from duping consumers. In recognition that label imagery and graphics can convey specific messages to consumers, the PPIA explicitly requires the USDA to ensure that "graphic matter" on poultry products—i.e., pictures, graphics, and illustrations on the label—does not convey a false impression about the products.

4.      The USDA, through its subagency, Defendant Food Safety and Inspection Service ("FSIS"), reviews proposed poultry product labeling to determine compliance with regulatory requirements. FSIS must determine that labeling complies with statutory and regulatory requirements and that it is not false or misleading before approving it for use in the marketplace.

5.      Despite this mandate, FSIS does not consider any graphic matter or imagery on the poultry product labels it reviews and approves for use in the marketplace. It ignores imagery and graphics, looking exclusively at the content and placement of written statements and claims.

6.      This is a case under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenging the policy, pattern, and practice of the USDA and FSIS, under the authority of Secretary Rollins (collectively, "Defendants"), of categorically failing to consider graphics when reviewing and approving poultry product labels under the PPIA. This policy, pattern, and practice includes Defendants' decisions to approve the labeling of Perdue Farms' ("Perdue") Fresh Cuts and Fresh products (together, "Fresh Line") without reviewing the misleading graphics on the Perdue Fresh Line labeling.

7.      The labels on Perdue's Fresh Line products peddle a vision of birds foraging under the sun in a pasture outside of a barn:



8.      In reality, Perdue's Fresh Line products are sourced from chickens and turkeys raised entirely indoors in warehouses, never touching a blade of grass.

9.      FSIS's decision, under authority of the USDA and Secretary Rollins, to ignore the PPIA's express statutory directive and turn a blind eye to Perdue's Fresh Line label imagery allows the company to mislead consumers with images that falsely represent that the chickens and turkeys sold as Perdue products were afforded access to the outdoors.

10.     But Defendants' failure is not limited to the Perdue Fresh Line labels. Their practice of ignoring graphics and imagery when approving poultry product labels allows the widespread use of misleading labeling in the marketplace in contravention of the PPIA.

11.     Defendants' actions are squarely at odds with the PPIA's plain language. Plaintiffs therefore request this Court declare unlawful and set aside FSIS's approval of Perdue's Fresh Line labels, and further enjoin Defendants from continuing to unlawfully ignore graphics in the review and approval of poultry product labels.

## JURISDICTION, VENUE, AND RELIEF

12.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this action constitutes a federal question under the APA, 5 U.S.C. §§ 551-801, and the Poultry Products Inspection Act, 21 U.S.C. §§ 451-72.

13.    Venue is proper in this Court under 28 U.S.C. § 1391(e). Defendants USDA and FSIS are headquartered in the District of Columbia and a substantial part of the events or omissions giving rise to this action occurred in this district.

14.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief is authorized by Federal Rule of Civil Procedure 65 and the APA, 5 U.S.C. § 706.

## PARTIES

### Plaintiffs

15.    Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national animal advocacy non-profit headquartered in Cotati, California, with over 300,000 members and supporters.

16.    ALDF pursues its mission "to protect the lives and advance the interests of animals through the legal system" by advocating against cruelty to animals and for the protection of animals used in commercial enterprises, including animal agriculture. The large-scale mistreatment of animals in industrial agriculture and the lack of legal protection for these animals has led ALDF to focus significant organizational resources on educating the public about animal cruelty and other societal ills caused by factory farming and advocating for greater legal protections for animals in agriculture.

17.    In furtherance of its mission, ALDF has long devoted organizational resources and efforts to increasing consumer awareness of the treatment of animals in industrial agriculture and to creating public pressure that leads to improvements in the welfare of farmed animals, including chickens and turkeys raised in intensive confinement operations like those Perdue uses.

18.    ALDF's advocacy and educational efforts related to transparency have taken many forms, including: conducting and publicizing undercover investigations of industrial farms and slaughterhouses; recruiting farm whistleblowers and challenging laws restricting or criminalizing farm whistleblowing and undercover investigations; litigating and advocating for public accessibility to government decision-making concerning factory farming; submitting public records and Freedom of Information Act ("FOIA") requests and publicizing information related to farmed animal raising, treatment, and slaughter; drafting and publicizing whitepapers

concerning industrial farming; and conducting webinars, education events, and social media campaigns on matters related to industrial farming.

19.     One of the signature focus areas in ALDF's work to expose and reform factory farming is curbing the misleading labeling and advertising of animal products. Through a variety of advocacy channels and fora, ALDF seeks to hold accountable industry players like Perdue that use inhumane intensive confinement of animals to maximize profits while misleadingly labeling and marketing their products as humane or naturally raised. ALDF advances its organizational efforts to combat "humane-washing" and other misleading marketing of animal products through public education initiatives, media campaigns, legal resources and webinars, consumer protection litigation, and legislative and regulatory advocacy.

20.     ALDF has long engaged federal regulators—including the USDA and the Federal Trade Commission ("FTC")—to advocate for the robust enforcement of federal labeling and consumer protection laws so as to prevent "humane-washing" and "greenwashing" by animal product sellers. ALDF routinely submits comments to federal agencies concerning misleading labeling on chicken and turkey products like those at issue here.

21.     For example, in recent years ALDF commented on FSIS's "clarification" on the "free range" label claim for poultry products (*see* ALDF, Comment Letter on Revised Compliance Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submission (Feb. 25, 2020), https://www.regulations.gov/comment/FSIS-2016-0021-13705) and on the agency's reissuance of its Animal Raising Claims labeling compliance guideline (ALDF, PETA & Compassion Over Killing, Comment Letter on FSIS's Compliance Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submission (Dec. 5, 2017), https://www.regulations.gov/comment/FSIS-2016-0021-4559).

22.     ALDF has also commented on the USDA's approach to "natural" claims on meat and poultry product labels (ALDF & Ctr. for Biological Diversity, Comment Letter on Use of the Term "Natural" in the Labeling of Human Food Products (May 9, 2016), https://www.regulations.gov/comment/FDA-2014-N-1207-6692), petitioned for USDA and FSIS to withhold the Official USDA mark from the labels of foie gras products (Petition No. 11-09,

USDA (Sept. 1, 2011)), and petitioned the FTC and USDA to change the labeling requirements for eggs sold in the United States. *See, e.g.,* Petition No. 28, FTC (Dec. 30, 2010).

23.    In sum, ALDF has a demonstrated interest in effective regulation of poultry products labeling and has long engaged in regulatory advocacy to further its organizational objectives of increasing transparency in animal agriculture so as to educate consumers and bolster reforms to cruel industrial farming methods and practices.

24.    ALDF has also worked to stop misleading advertising in animal agriculture by bringing consumer protection lawsuits. For example, ALDF directly sued Hormel Foods in connection with the meat products, including poultry products, that Hormel advertised as "Natural Choice." *See ALDF v. Hormel*, 258 A.3d 174 (D.C. 2021). Courts have held that this form of consumer protection regulation of advertising is available "so long as [it] do[es] not encroach on the labeling itself." *Id.* at 191-93.

25.    ALDF's campaign to end intensive confinement of animals used for food and increase transparency in the labeling of animal products is hindered by FSIS's arbitrary and capricious and unlawful decision-making. By abdicating any responsibility to review graphic matter on labels submitted for FSIS's review, FSIS ignores ALDF's evidence of deceptive labeling in meat and poultry products. In approving Perdue's Fresh Line labels in particular, FSIS ignores the deceptive portrayal of factory farmed birds as raised on open, grassy pasture. Through this failure, FSIS acted unlawfully and limited the effectiveness of ALDF's advocacy to educate its members and other consumers about—and end—the intensive confinement of farmed chickens and turkeys.

26.    To be a member of ALDF, one must have made a financial donation to ALDF within the past five years. ALDF has records that identify its current and former members, which allow it to communicate regularly with those groups about its work and other issues of interest to ALDF members.

27.    ALDF's membership base includes animal guardians, vegan product consumers, meat and dairy consumers, zoo and sanctuary visitors, and outdoor enthusiasts. ALDF's current membership includes, among numerous others, co-plaintiffs Lisa Dowell and Christina Manos-

Bocek, and members of ALDF's leadership, such as the Executive Director and every current member of ALDF's Board of Directors.

28.    Over each of the past five years, financial contributions from individual members constituted more than half of ALDF's total revenue.

29.    This means a substantial amount of revenue comes from ALDF's membership, considering that ALDF's revenue in its most recent publicly available Form 990 IRS filing (for fiscal year 2023, from July 1, 2022, to June 30, 2023) was over $20 million. More than $10 million of fiscal year 2023 revenue came from individual members. These voluntary ALDF member donations demonstrate that ALDF's programmatic work is material to them, so much so that they proactively and voluntarily provide funding to support that work and do not passively follow ALDF's work.

30.    This membership funding also includes donations that specific individual members designate as restricted to specific areas of work that align with subject matters most important to them. In fiscal year 2023, individual members provided more than $1 million in such restricted funding. This large amount of restrictive funding shows that members use their funding to specifically direct ALDF to continue to invest and grow certain areas of its work—including work to increase transparency in factory farming, like the issues in the case here.

31.    ALDF has a Board of Directors, made up of ALDF members, which is responsible for managing the activities and affairs of the organization, and all corporate powers are exercised under the ultimate direction of the Board of Directors. The Board of Directors reviews and approves ALDF's mission, strategic planning to achieve the mission, and organization resources dedicated towards activities to achieve the mission. The Board of Directors delegates general authority to the Executive Director to supervise, direct, and control the business and other activities of ALDF.

32.    Each member of the Board of Directors is elected to the Board via a vote by the Board of Directors. The Board of Directors also hires the Executive Director, and the Executive Director is ultimately accountable to the Board. Because the current Board comprises members of ALDF, it follows that ALDF members ultimately control ALDF's governance.

33.     ALDF members often take individual or collective action with other members in response to ALDF's information-sharing alerts. For example, ALDF members are often invited and sign on to ALDF petitions or comments before federal and state regulatory bodies. This includes regulatory matters that relate to issues in this case, like a recent request that the federal government require companies to disclose when their products contain animal ingredients.

34.     ALDF members influence ALDF's organizational activities in a variety of ways. For example, ALDF members submit tips to bring instances of animal cruelty and harmful welfare conditions to ALDF's attention. ALDF's programmatic work, including litigation like this, seeks to advance its mission and represent its members' interests in achieving that mission.

35.     ALDF also surveys and receives direct feedback from its members, and this information is then used to guide and shape aspects of ALDF's work. For example, ALDF surveys its members about topics to include in its Animal Law Academy webinars and presentations and its Animal Law Conference. ALDF specifically invites members to attend the webinars (which occur throughout the year) and Animal Law Conference (which occurs once a year). After each webinar finishes, ALDF asks the attending members to complete a survey, and their feedback is used to determine the content of future webinars. Similarly, ALDF surveys members who attended the Animal Law Conference about everything from the content of the conference's speaker panels to the type of food provided, and their feedback is used to shape the agenda, vendors, and more for subsequent iterations of the Animal Law Conference.

36.     ALDF suffers associational injury through its members, who have purchased Perdue's Fresh Line products when relying on the products' false and misleading labels—especially the labels' graphic imagery.

37.     For example, LISA DOWELL, an ALDF member who is also an individual Plaintiff, has purchased Perdue Fresh Line chicken and turkey products for over three years, based on her impression that the Fresh Line products came from chickens and turkeys raised in conditions that were humane and that offered better welfare than products from other companies.

38.     Ms. Dowell has been an ALDF member since May 2021. She is a vegetarian and has been since age 13, when she witnessed her childhood friend decapitate a turkey her friend

raised as part of a 4H program. For several years, she raised chickens outside her house and would eat the eggs they laid.

39.    Even though she does not eat meat, Ms. Dowell purchases chicken and turkey products for her three dogs and her son. Her 13-year-old chihuahua, named Bumble, has heart disease and must take pills twice a day. He will only take the pills if they are placed in ground chicken or turkey. And because she gives Bumble chicken and turkey products, she feels obligated to also feed her other two dogs—Zeus and Cash—the same meat. Ms. Dowell also buys chicken for her teenage son, who feels he needs to eat meat to get enough protein and lives with her. She feels compelled to continue to buy chicken and turkey products to feed to her dogs and son.

40.    Ms. Dowell lives in Northern Virginia and typically shops at Target and Giant grocery stores, which sell Perdue Fresh Line chicken and turkey products. She will also on occasion shop at Safeway, which sells Signature Farms chicken and turkey products, especially when she visits her mother. She has also bought chicken and turkey products online but prefers to shop in person. She has for several years bought Perdue Fresh Line chicken and turkey products on a weekly basis for her dogs and son—in particular, she has regularly bought the chicken breasts, ground chicken, thin-sliced breast, and ground turkey. She also regularly sees Signature Farms chicken and turkey products when grocery shopping.

41.    Ms. Dowell regularly bought the Perdue Fresh Line products because she believed that the chickens and turkeys used for the meat were raised in more humane conditions than chickens and turkeys raised for other companies' meat products. She believes that if animals must die for us to eat them, then they should be treated well during their lives.

42.    Ms. Dowell's purchases, which were based on her belief that the Perdue Fresh Line products came from what she thought were humane raising conditions, were influenced by the products' labels. When she looked for Perdue meat in the grocery store, she saw Perdue Fresh Line products and the label and packaging persuaded her to buy them. She saw the labels' image of a chicken in the sunshine and thought to herself, "This must be how the birds live." Her

belief that the chickens and turkeys raised for the products roamed outside on pasture was further entrenched by the "Raised Cage Free" wording on the packaging.

43.     To Ms. Dowell, images and graphics on labels are very important in her purchasing decision. The imagery draws her attention and informs her about what she is buying. In addition, the imagery on the label helps her make a decision when shopping because, among other reasons, she finds grocery stores chilly and does not want to scrutinize products for long in the refrigerator or freezer aisles. In the case of the Perdue Fresh Line products, the images conveyed to her that Perdue was raising "happy" chickens that roamed outdoors.

44.     Ms. Dowell was dismayed to learn that the chickens and turkeys used in Fresh Line products live the entirety of their lives inside, without exposure to the outdoors and often without exposure to natural sunlight. This discovery upset her, made her feel like she was misled, and made her feel foolish because she spent money supporting industry practices she opposed. She will continue to buy chicken and turkey products but now will not buy Perdue's Fresh Line products because she knows the animals are not raised in conditions she believes to be humane.

45.     FSIS's unlawful approvals of Perdue Fresh Line labels caused Ms. Dowell consumer harm. She now no longer trusts or has any level of confidence in the Perdue Fresh Line labels.

46.     Because FSIS is not reviewing graphics and imagery as part of its approval of labels, it is not evaluating whether this imagery makes the poultry product labels false or misleading.  Ms. Dowell was misled by the imagery depicting birds outdoors on the Perdue Fresh Line chicken and turkey labels that FSIS approved. When making future poultry product purchases for her dogs and son at stores that sell other products with labels that depict humane raising conditions, such as Signature Farms, she will continue to suffer a lack of confidence in whether any such labels convey accurate descriptions of the product's animal raising conditions. She no longer trusts the imagery on chicken and turkey labels—even though some product labels may accurately depict the animals' raising conditions.

47.     If the Court vacates approval of Perdue's Fresh Line label or all labels that use imagery to depict animal raising conditions, orders FSIS to review the imagery on all chicken

product labels, or enjoins FSIS from approving chicken product labels without considering graphic imagery, Ms. Dowell would have increased confidence that any depictions of chickens and turkeys on labels accurately represent the conditions in which the animals were raised, and would have more confidence in her purchasing decisions. She wants to return to making purchasing decisions based on what the imagery conveys and would do so if she had confidence in the accuracy of the labels.

48.    CHRISTINA MANOS-BOCEK, another ALDF member who is also an individual Plaintiff, has occasionally purchased Perdue Fresh Line chicken products over the past few years.

49.    Ms. Manos-Bocek has lived in California and North Carolina, and now lives in Doylestown, Pennsylvania. In California, she shopped for chicken products at Ralph's, which sells Perdue Fresh Line products, and Safeway, which sells Signature Farms products. In North Carolina, she shopped for chicken products at Harris Teeter, which sells Perdue Fresh Line products. She now shops for chicken products in Pennsylvania at Giant and Wegman's, which sell Perdue Fresh Line products.

50.    Ms. Manos-Bocek was an ALDF member between 2005 and 2011 and again became a member starting in 2018.

51.    Ms. Manos-Bocek feels compelled to eat meat because she has been admonished by her doctors to eat more protein. She prefers to avoid red meat but finds chicken meat palatable. She also purchases chicken products for her daughter and husband.

52.    When she shops for chicken products, Ms. Manos-Bocek looks for conditions she believes cause the chickens to lead good lives until the point they are killed. For her, these conditions include the chickens being raised outdoors on pasture, fed a vegetarian diet such that they are not cannibals, and being free from antibiotics and steroids.

53.    Ms. Manos-Bocek has occasionally bought the Perdue Fresh Line chicken products because she relied on visual cues. The imagery on the label provided a color scheme of blue and green land with a yellow sun, giving her the feeling that the meat came from happy chickens raised outside. She had previously bought organic Perdue chicken—which she knows

comes from chickens raised outdoors—and, in seeing that the Fresh Line label includes the same depictions of chickens outside of a barn, she believed the products' raising conditions were similar. Her quick scan of the Perdue Fresh Line label imagery and its similarity to the Perdue organic chicken products caused her to purchase the Perdue Fresh Line products.

54.     Upon discovering that chickens used in Perdue Fresh Line products are not raised outdoors and on pasture, Ms. Manos-Bocek was upset and offended and felt deceived. She views herself as someone who reads about and researches the food she buys, yet she is confused about what the label imagery means.

55.     Because FSIS is not reviewing graphics and imagery as part of its approval of labels, it is not evaluating whether this imagery makes the poultry product labels false or misleading. As a result, when making future poultry product purchases, Ms. Manos-Bocek will continue to suffer a lack of confidence in whether any chicken labels convey accurate descriptions of the product's animal raising conditions. She no longer trusts the imagery on any chicken labels, even though some product labels, such as the Perdue organic chicken products, may include imagery that accurately depicts the animals' raising conditions.

56.     If the Court vacates approval of Perdue's Fresh Line label or all labels that use imagery to depict animal raising conditions, orders FSIS to review the imagery on all chicken product labels, or enjoins FSIS from approving chicken product labels without considering graphic imagery, Ms. Manos-Bocek would have increased confidence that any depictions of chickens on labels accurately depicts the conditions in which the chickens lived, and would have more confidence in the labels she is purchasing. She wants to return to making purchasing decisions based on what the imagery conveys and would do so if she had confidence in the accuracy of the labels.

57.     A vacatur of FSIS's approvals of Perdue's Fresh Line label and an order requiring FSIS to cease its unlawful review of poultry product labels will remedy ALDF's members' consumer injuries. The vacatur would remove the Perdue Fresh Line label representations from the market, eliminating the chance that Ms. Dowell, Ms. Manos-Bocek, and other ALDF

members would continue to purchase chicken products they mistakenly believe come from chickens raised in outdoor, bucolic conditions.

58.    A court order requiring FSIS to review graphic imagery and to ensure truthful graphic imagery as part of its label approval process would allow Ms. Dowell, Ms. Manos-Bocek, and other ALDF members to purchase products, like Perdue's chicken products, with greater confidence in knowing that label depictions of animals represent reality.

59.    ALDF's members' interests in label representations that accurately reflect the conditions in which animals are raised are germane to ALDF's purpose of protecting animals used in commercial enterprises, including in industrial animal agriculture.

## Defendants

60.    BROOKE ROLLINS is the Secretary of Agriculture and is responsible for administering the PPIA. Secretary Rollins is ultimately responsible for the USDA and FSIS's decision to approve Perdue's Fresh Line label applications and for the agency's practices with respect to poultry product labeling.

61.    The UNITED STATES DEPARTMENT OF AGRICULTURE is responsible for administering the PPIA and ensuring that poultry products distributed to the public are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

62.    The FOOD SAFETY AND INSPECTION SERVICE is the subagency that approved Perdue's applications for its Fresh Line product labeling. A component of the USDA, the Food Safety and Inspection Service conducts all pre-market review of poultry product labeling under the PPIA.

## LEGAL FRAMEWORK

### The Poultry Products Inspection Act

63.    The primary purpose of the PPIA is to ensure that poultry products distributed to the public are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

64.    To accomplish this purpose, Congress declared its policy to "provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution

of such articles . . . to prevent the movement or sale in interstate or foreign commerce of, or the burdening of such commerce by, poultry products which are adulterated or misbranded." 21 U.S.C. § 452.

65.    The PPIA prohibits the sale of false or misleading poultry products. 21 U.S.C. §§ 458(a)(2), 457(c). Under the PPIA, a product is misbranded and prohibited from sale "if its labeling is false or misleading in any particular." 21 U.S.C. § 453(h)(1).

66.    "Labeling" is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 453(s).

67.    The term "label," in turn, is defined as "a display of written, printed, or *graphic matter*" upon a container. *Id.* (emphasis added).

68.    Regulations implementing the PPIA also prohibit misleading words, graphics, or marks from appearing on labeling, in whole or in part: "No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, *picture*, *design*, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling. No product shall be wholly or partly enclosed in any wrapper, packaging, or other container that is so made, formed, or filled as to be misleading." 9 C.F.R. § 317.8(a) (emphasis added); *see also* 9 C.F.R. § 381.129(b) ("No statement, word, *picture*, *design*, or device which is false or misleading in any particular or conveys any false impression or gives any false indication of origin, identity, or quality, shall appear on any label.") (emphasis added).

69.    The PPIA is enforced by the USDA, which has empowered FSIS to review labels on poultry containers to prevent misbranded products from entering commerce. 21 U.S.C. § 452.

70.    Under the regulatory scheme, unless considered "generically approved labels," poultry product labels must be submitted to FSIS for regulatory review and approval before they can be used in the market. *See* 9 C.F.R. § 412.1. This process is referred to as "pre-market review."

71.     "Generically approved labels" are those "bear[ing] all applicable mandatory labeling features (i.e., product name, safe handling statement, ingredients statement, the name and place of business of the manufacturer, packer or distributor, net weight, legend, safe handling instructions, and nutrition labeling) in accordance with Federal regulations," which "bear claims and statements that are defined in FSIS's regulations or the Food Standards and Labeling Policy Book (except for natural and negative claims)," and which comply with federal regulations. 9 C.F.R. § 412.2(b). FSIS must still ensure such "generically approved labels" are not false or misleading in any particular, by "select[ing] samples of generically approved labels from the records maintained by" poultry product establishments "to determine compliance with label requirements." 9 C.F.R. § 412.2(a).

72.     By contrast, labels bearing "special statements and claims" are not eligible for generic approval and must be submitted for pre-market review. 9 C.F.R. § 412.1(c)(3). "'Special statements and claims'" are "claims, logos, trademarks, and other symbols on labels that are not defined in the Federal meat and poultry products inspection regulations or the Food Standards and Labeling Policy Book, (except for 'natural' and negative claims (e.g., 'gluten free')), health claims, ingredient and processing method claims (e.g., high-pressure processing), structure-function claims, claims regarding the raising of animals, organic claims, and instructional or disclaimer statements concerning pathogens (e.g., 'for cooking only' or 'not tested for E. coli O157:H7'). Examples of logos and symbols include graphic representations of hearts and geographic landmarks." 9 C.F.R. § 412.1(e).

73.     The FSIS Guideline on Documentation Needed to Substantiate Raising Claims for Label Submissions ("FSIS Guideline") provides producers with information about how to use and substantiate animal raising claims on labels that must undergo pre-market review. The FSIS Guideline was issued in 2016 and updated in 2019 and 2024.

74.     The FSIS Guideline does not discuss graphic imagery on labels that make animal raising claims or describe the criteria FSIS uses to determine whether such imagery is misleading to consumers.

75.     In the pre-market review process, the poultry product establishment must submit a labeling application to FSIS that includes a sketch label. The sketch label must "clearly reflect and project the final version of the label," including "all labeling features, size, and location." 9 C.F.R. § 412.1(d). The pre-market review of sketch labels is meant to ensure that poultry product labeling is not "false or misleading in any particular," as the PPIA requires. 21 U.S.C. § 457(d). Through FSIS, the USDA is tasked with ensuring that any such "misbranded" products do not enter or remain in commerce.

### The Administrative Procedure Act

76.     Courts shall "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in "excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

77.     "Agency action" includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13); *see also id.* § 701(2).

78.     Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

### FACTS

79.     Perdue is an industrial meat production company. It is the fourth largest poultry production company in the United States.

80.     Perdue is a vertically integrated corporation. This means Perdue controls the production of its chickens and turkeys at every stage of their short lives. Perdue controls the breeding operations, hatcheries, and grow-out operations (commonly known as confined animal feeding operations, or "CAFOs"), as well as feed mills, slaughterhouses, and processing plants. Perdue also controls the transportation and distribution networks between these facilities.

81.     In the grow-out "broiler" houses (*i.e.*, the CAFOs that warehouse chickens raised for meat) and inside the turkey CAFOs, integrators like Perdue also control lighting duration and

intensity, requiring that lighting conditions be kept according to specifications that cause the birds to grow faster in shorter amounts of time.

82.    Broiler houses require large fans for ventilation because the massive number of animals packed into the building create so much waste that the ambient ammonia levels would cause illness and death to the birds and workers without ventilation.

83.    According to Perdue's 2020 Animal Care report, as of July 2020 only half of Perdue's grow-out broiler houses had installed windows to allow in natural light.

84.    In July 2016, a *Washington Post* column noted that only 10 percent of birds raised for Perdue products had outdoor access and quoted a senior vice president at Perdue as saying, "Not every area [in the country] is appropriate for outdoor access." The situation has not improved in the past five years; in November 2019, Perdue's webpage of Frequently Asked Questions about its animal care explained that its "modern" chicken houses are "fully enclosed," and according to Perdue's 2020 Animal Care report, around 75 percent of the company's poultry houses provide no access to the outdoors.

85.    Indeed, in its 2020 Animal Care report, Perdue wrote it is increasing the number of chicken houses with "outdoor access" so as "to meet customer and consumer demand for PERDUE® HARVESTLAND® *organic and free-range chicken*," specifically (emphasis added). Thus, only a subset of the chickens and turkeys Perdue raises for slaughter and sale—and only those who are ultimately sold as "Organic and Free Range" Perdue products—have access to the outdoors, let alone the freedom to roam in open pastures.

86.    When a consumer reaches for a Perdue chicken or turkey product that is not "organic" or "free-range," that poultry product is the meat of a bird who spent his or her brief life inside a CAFO—a large, crowded warehouse—before being crammed into a cage and shipped to a slaughterhouse.

87.    Chickens and turkeys raised for the Perdue Fresh Line are neither marketed as "organic" nor as "free-range." The chickens and turkeys raised for the Perdue Fresh Line are therefore raised entirely indoors.

88.     On May 24, 2018, Perdue submitted its first sketch label application for "Whole Chicken and Chicken Parts Blanket" in its Fresh Line. The application noted that "Animal Production/Breed/Raising" is one of the "special claims [or] guarantees" on the label.

89.     Perdue included sketches of the product's labels along with the May 2018 application. The sketches included the following image:



90.     The May 2018 application included as "documentation for animal raising claims" five certificates from USDA, each certifying that Perdue had "met the requirements of the USDA Process Verified Program" at five different Perdue industrial agriculture "complexes."

91.     USDA performs and requires on-site audits of Perdue's CAFOs through the Process Verified Program. As part of the program, a USDA Agriculture and Marketing Service ("AMS") auditor must evaluate "comfort" and "shelter" at Perdue's hatcheries, grow-out facilities, and slaughterhouses.

92.     The Perdue "complexes" that USDA certified through the Process Verified Program include hatcheries, grow-out facilities, and slaughterhouses associated with slaughter and processing plants in Accomac, Virginia; Beaver Dam, Kentucky; Lewiston, North Carolina; Milford, Delaware; and Georgetown, Delaware.

93.     FSIS approved the May 2018 application on July 9, 2018, which it recorded as approval number 91102009.

94.     The approval required one minor modification to the label's text elsewhere on the package. FSIS's modification removed the word "healthy" from the sentence: "Care for animals and respect for the land go hand in hand with healthy eating." FSIS otherwise approved the 2018 Application.

95.     FSIS's approval of the May 2018 application did not require any changes to the image shown in paragraph 58, above.

96.     On November 29, 2018, Perdue submitted a nearly identical label application for its Fresh "Cuts" Line.

97.     The proposed label applied to products involving "single ingredient raw chicken parts" coming from chickens hatched, raised, and slaughtered in the same Accomac, Beaver Dam, Lewiston, Milford, and Georgetown complexes as those identified in the May 2018 application.

98.     The only difference between the May 2018 application and the November 2018 Application was "statement" text regarding how Perdue raised the chickens.

99.     The sketch of the label submitted in the November 2018 application included the same graphics displaying hens pecking for food in an outdoor pasture. The sketch is shown below:



100.   On January 17, 2019, FSIS approved the November 2018 application.

101.   FSIS did not require Perdue to make any changes to the label's graphic imagery.

102.   The imagery on the 2018- and 2019-approved labels is misleading. Contrary to the bucolic scene of chickens on a pasture outside of a barn, surrounded by verdant plants and sunshine, the chickens who are made into Perdue's Fresh Line of chicken products never have

access to the outdoors in their short lives—let alone the freedom to roam and forage on a pasture. At least half never even experience natural light from the sun through a window.

103.    In reality, Perdue's chickens are confined in massive numbers to a large building where Perdue controls the light and temperature conditions they experience in order to most efficiently grow them into a target amount of meat.

104.    The only time the chickens who become Perdue's Fresh Line might experience direct exposure to the outdoors is on the truck that drives them from the grow-out facility to the slaughterhouse.

105.    Through its Process Verified Program, USDA was well aware the imagery on the labels was misleading when, through FSIS, it approved both the 2018 and 2019 Applications. USDA's AMS inspectors involved in certifying Perdue's Process Verified Programs at the Accomac, Beaver Dam, Lewiston, Milford, and Georgetown complexes would have observed that Perdue's conventionally raised chicken for its Fresh Line products had no access to the outdoors, let alone the ability to peck and forage in open pasture.

106.    FSIS recently explained that it "often consults with its federal partners, *e.g.*, the USDA's AMS, to decide whether the documentation submitted in support of an animal-raising claim provides the level of detail needed to ensure that the claim is truthful and not misleading." Notice of Availability of Animal Raising Guideline, 84 Fed. Reg. 71359, 71362 (Dec. 27, 2019).

107.    In briefing before the District of New Jersey federal court, Perdue explained, "FSIS has specifically advised that it even evaluates the truthfulness of the 'USDA Process Verified' claims independently from AMS." Reply in Supp. of Perdue Farms Inc.'s Mot. for J. on the Pleadings at 20, *Hemy v. Perdue Farms Inc.*, 3:11-cv-00888 (D.N.J. May 19, 2014) (Dkt. 87). To support this statement in its briefing, Perdue attached a July 11, 2011, letter in which FSIS looked to AMS's operation of the Process Verified Program to determine that "Perdue's chickens are not raised in cages." Certification of David D. Conway in Supp. of Perdue Farms Inc.'s Reply in Further Supp. of its Mot. for J. on the Pleadings at 5, *Hemy v. Perdue Farms Inc.*, 3:11-cv-00888 (D.N.J. May 19, 2014) (Dkt. 87-1).

108.    On information and belief, Perdue submitted a "blanket" application for Fresh Line turkey products label that contained nearly identical imagery to the Fresh Line chicken products label.

109.    On information and belief, FSIS approved the label application for Perdue's Fresh Line turkey products.

110.    The following image is of the label on Perdue Fresh Line turkey products that are available in grocery stores and other retailers. Because the label, like the chicken product label, bears "special statements and claims" (such as "no hormones or steroids**"), Perdue would not have been able to market products with this label without pre-market review and approval of the label by FSIS.



111.    On January 3, 2020, ALDF submitted a package of information to FSIS, explaining that label imagery like Perdue's, showing chickens and turkeys outside of a barn,

under the sun, and surrounded by vegetation, for products that are not "organic" and "free range," is misleading and contrary to how the animals were raised.

112.    ALDF's package included a consumer survey of labels on three of Perdue's Fresh Line products, which ALDF commissioned from a research consultant. The survey of 1,004 adults, which occurred October 14-16, 2019, found that 29% of respondents interpreted the chicken labels to mean that the chickens were "given access to a barnyard/pasture" and 19% of respondents interpreted the turkey label to mean the turkeys "were given access to a barnyard/pasture."

113.    In its January 2020 package, ALDF requested that FSIS "decline to approve any Perdue label applications that contain the same or similar imagery" to the Perdue Fresh Line labels depicting chickens and turkeys in a pastoral scene outside of a barn and under the sun. ALDF explained that such label approvals "would allow highly misleading product claims into the market," in violation of the PPIA.

114.    FSIS responded to ALDF's request on March 30, 2020, via letter from Rachel Edelstein, the Acting Assistant Administrator for Office of Policy and Program Development at FSIS ("2020 Edelstein letter").

115.    The 2020 Edelstein letter rejected ALDF's request, stating that "the images [at issue] are not in violation [of] FSIS labeling requirements and can be used on product."

116.    Explaining its reasoning, the 2020 Edelstein letter stated not that FSIS had actually reviewed the images to ensure that they are not misleading, but that "[t]he photos, colors, and graphics used on packaging are not considered labeling claims and do not make the product label false or misleading."

117.    FSIS therefore did not evaluate the graphic imagery Perdue submitted along with its May 2018 and November 2018 applications for label approvals for its Fresh Line chicken products. On information and belief, nor does FSIS evaluate the graphic imagery that any poultry producer submits along with its application for approval of labels under the PPIA. This includes the graphics on Perdue's Fresh Line turkey products, which, on information and belief, Perdue also submitted to FSIS for pre-market approval.

118.    On September 21, 2020, months after FSIS received the January 2020 package of materials from ALDF, Perdue again applied for sketch label approval of several of Perdue's Fresh Line products, including Chicken Thigh Filets, Chicken Wings, and Chicken Thighs. The graphics on the labels appear identical to the graphics in FSIS's 2018 and 2019 approvals.

119.    The FSIS official reviewing the application initially rejected the application, stating that Perdue needed "to provide documentation for animal raising claims." In response, Perdue sent FSIS the Process Verified Program certifications associated with the USDA AMS inspection of the four complexes that Perdue uses to raise and slaughter the chickens for the Fresh Line products at issue in the September 2020 application.

120.    After receiving the Process Certified Program certificates, on September 22, 2020, FSIS approved the sketch labels for Perdue's Fresh Line Chicken Thigh Filets, Chicken Wings, and Chicken Thighs.

121.    There is no evidence FSIS evaluated the graphic imagery Perdue submitted along with its September 2020 application for label approval of its Fresh Line chicken products. Nor did FSIS consider ALDF's January 2020 package of materials demonstrating the misleading nature of Perdue's Fresh Line labels when it approved the September 21, 2020, label application.

122.    Two years later, on April 20, 2022, FSIS wrote to ALDF to "clarify" its March 30, 2020, response to ALDF's request that FSIS decline to approve Perdue Fresh Line labels with misleading imagery via another letter from Rachel Edelstein ("2022 Edelstein letter").

123.    The 2022 Edelstein letter stated that in the 2020 Edelstein letter, FSIS "intended to convey that the photos, colors, and graphics used on [the Perdue Fresh Line labels] are not considered labeling claims and did not make the product false or misleading."

124.    The letter also stated that "FSIS did review the graphics and images" on Perdue's Fresh Line labels but determined that the illustrations were "merely marketing puffery." It explained that "[a]s marketing puffery without an associated labeling claim, the Agency concluded that the Perdue labels were not false or misleading."

125.    There is no mention of "marketing puffery" on any of the Perdue Fresh Line label approval documents.

126.    Perdue Fresh Line chicken and turkey products marketed with labels containing the bucolic imagery of chickens and turkeys outside of barns, under the sun, and surrounded by green vegetation continue to be sold throughout the country.

127.    There are many other chicken and turkey products currently sold at grocery stores, on online apps, and appearing otherwise on the market that include graphic imagery of chickens and turkeys on grass or barns with access to pasture.

128.    For example, the Albertson Companies market chicken products under the brand "Signature Farms." The Signature Farms "all natural" chicken labels include imagery of a chicken standing on a fence in front of rolling hills of green pasture. One such label is below. Signature Farms "all natural" chicken product labels bear animal raising claims such as "natural" and "raised with no added hormones" that make them ineligible for generic approval and subject to FSIS pre-market review under 9 C.F.R. § 412.1(c)(3) &(e).



129.    In 2024, ALDF submitted two FOIA requests for all records over the prior five years related to FSIS's review and approvals of Signature Farms "all natural" chicken products. After conducting a search, the FSIS FOIA Office was unable to find any records reflecting FSIS's review and approval of these product labels. The FOIA Office also stated that it believed, but could not confirm, that the labels may have been generically approved without FSIS review.

130.    Signature Farms chicken and turkey products are available at a wide variety of grocery stores owned by the Albertson Companies, including Safeway, Albertsons, Vons, Jewel-Osco, and many more.

131.    Albertson Companies stores also sell Perdue Fresh Line products.

132.    Grocery stores even place Signature Farms and Perdue Fresh Line products adjacent to each other. For example, Signature Farms and Perdue Fresh Line chicken products were sold next to each other in the same bin in a Washington, D.C., Safeway in April 2024. This practice of product placement continues.



133.    Several other chicken and turkey products have labels with bucolic imagery of animals outdoors and barns with open doors. These include, among others, Farmer Focus, Shady

Brook Farms, and Applegate Naturals products. Images of these product labels, taken from their websites, are below.







134.    Public records demonstrate that when FSIS reviews poultry product labels that make animal raising claims, such as Applegate Naturals products, it does not evaluate the imagery on the labels to determine whether they are false or misleading.

135.    For example, in April 2018, Applegate submitted a sketch label application for "Applegate Naturals Oven Roasted Turkey Breast" with the sketch pictured below. The imagery on the sketch label depicted a turkey embedded with the phrase "Applegate Humanely Raised" walking outdoors on grass.



136.    The application noted that "Animal Production/Breed/Raising" is one of the "special claims [or] guarantees" on the label.

137.    The application review form did not provide a field for evaluating label imagery, and the FSIS employee who reviewed the Applegate Naturals did not comment on the sketch label images.

138.    There is no evidence that FSIS reviewed the imagery on the Applegate Naturals label when it approved the label application on June 5, 2018.

139.    The FSIS's Strategic Plan for 2023-2026 states: "Consumers rely on the information on the label when they purchase FSIS-regulated products and reasonably expect it is truthful and not misleading. If it is not, consumers are not getting what they thought they paid for and competitors who follow labeling rules and guidance will be disadvantaged by those that do not."

## CLAIM FOR RELIEF

**Challenge to Pattern and Practice of Insufficient Pre-Market Label Review**

**Violation of the Administrative Procedure Act and Poultry Products Inspection Act**

140.    The approvals of label applications are final agency action and subject to judicial review. FSIS's pattern and practice of routinely approving Perdue's Fresh Line label applications without consideration of the graphic matter or imagery on the labels required under the plain terms of the PPIA is arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

141.    FSIS's policy, pattern, and practice of routinely approving poultry product label applications without consideration of the graphic matter or imagery on the labels required under the plain terms of the PPIA is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

142.    In making the 2018, 2019, and 2020 decisions to approve Perdue's Fresh Line label applications without consideration of the graphic matter or imagery on the labels, FSIS acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(A).

143.    The 2018, 2019, and 2020 decisions to approve Perdue's Fresh Line labels without consideration of the labels' graphic content exceeds Defendants' statutory jurisdiction and authority and is without observance of procedure required by law, within the meaning of the APA. *See* 5 U.S.C. § 706(2)(C)-(D).

144.    FSIS's pattern and practice of approving Perdue's Fresh Line label applications showing animals in natural, outdoor settings, despite knowing that the products come from animals raised entirely indoors, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

145.    FSIS's pattern and practice of approving label applications showing animals in natural, outdoor settings, despite knowing that the products come from animals raised entirely

indoors, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

146.    On information and belief, FSIS has not considered the "graphic matter [] upon any article or any of its containers or wrappers" in determining whether Perdue's Fresh Line labels submitted for pre-market review under the PPIA are false or misleading in any particular and, therefore, whether the poultry products are misbranded. 21 U.S.C. § 453(s); *see also id.* § 453(h)(1).

147.    On information and belief, FSIS has a policy of not considering the "graphic matter [] upon any article or any of its containers or wrappers" in reviewing whether a label submitted for pre-market review under the PPIA is false or misleading in any particular and, therefore, whether the poultry product is misbranded. 21 U.S.C. § 453(s); *see also id.* § 453(h)(1). This policy is ongoing.

148.    FSIS's actions in reviewing labels for adherence to PPIA's requirements are performed under the authority and control of the USDA and Secretary Rollins.

149.    Defendants' pattern and practice of failing to consider graphic matter as part of a product's label during pre-market review exceeds Defendants' statutory jurisdiction and authority and is without observance of procedure required by law, in violation of the APA. *See* 5 U.S.C. § 706(2)(C)-(D).

150.    Defendants' ongoing policy, pattern and practice of unlawful actions injure Plaintiff ALDF and its members, including Plaintiffs Dowell and Manos-Bocek, in the manners specified in the allegations set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority by categorically failing to consider graphic matter when approving poultry product labeling under the PPIA, including Perdue's Fresh Line labeling;

2.      Set aside as unlawful FSIS's decisions, under the authority and control of the USDA and Secretary Rollins, to approve poultry product labels currently on the market with graphic imagery that depicts animal raising conditions, including Perdue's Fresh Line products;

3.      Order Defendants to refrain from renewing poultry product labeling with graphic imagery that depicts animal raising conditions, unless and until Defendants determine that the label, including its graphic matter, is not misleading as that term is defined under the PPIA and its implementing regulations;

4.      Order Defendant FSIS to cease its policy and practice of failinplag to review graphic matter when evaluating poultry product label applications under the PPIA;

5.      Award Plaintiffs their reasonable attorneys' fees and costs in this action, and;

6.      Grant Plaintiffs such other and further relief the Court may deem just and proper.


Dated: February 18, 2025

Respectfully submitted,


Daniel H. Waltz (D.D.C. Bar No. D00424)
Caitlin Foley (*pro hac vice* forthcoming)

ANIMAL LEGAL DEFENSE FUND
611 Pennsylvania Ave SE #484
Washington, DC 20003
(707) 795-2533
dwaltz@aldf.org


*Attorneys for Plaintiffs Animal Legal Defense Fund, Lisa Dowell, and Christina Manos-Bocek*